## THE NEWPORT.

HATCH *et al. v.* THE NEWPORT, (NEW YORK & C. S. S. Co., Claimant.)

*(Circuit Court, S. D. New York.  October 15, 1888.)*

COLLISION—EVIDENCE—SUFFICIENCY—MATHEMATICAL DEMONSTRATION.

Upon a libel for collision the direct testimony was that claimant's steamer, at the moment of collision, was from seven to eight miles off shore, and that the schooner with which she collided sank within half a mile. Libelants urged that the schooner thus collided with was one they had lost, but the wreck of their schooner was found within four or five miles from shore. They undertook, however, to show, by mathematical demonstration, from certain bearings which had been taken, that the steamer could not have traversed the lines subtended by the angles thus formed, within the time allowed by her logs, upon any other course than one which was different from that shown by the direct testimony, but there was a variance of five minutes between the engineer's and steamer's logs, as made a short time before the collision. *Held,* that the demonstration based on these logs was not sufficient to break the force of the direct testimony, and that the schooner collided with was not that of libelants.

In Admiralty.  On appeal from district court, 28 Fed. Rep. 658.

Libel by Alfrederick S. Hatch and others against the steam-ship Newport, the property of the New York & Cuba Steam-Ship Company, claimant. From a decree for claimant, libelants appeal.

*Findings of Fact.*  (1) The libelants' schooner John K. Shaw left Newport News about noon on the 21st of February, 1884, bound for New Haven, with a cargo of 324 tons of coal and 110 tons of pig-iron, the iron being on deck.  (2) On the afternoon of February 24th some wreckage floating in the ocean off the Jersey coast was found by the tug-boat Maggie Moran, which was known to be part of the John K. Shaw by its having on it the bell of the Shaw.  This wreckage was part of her deck, with steering gear, on which deck was the taffrail and a portion of the rail on each side, there being no break where the rail joined the taffrail, and on it was also the starboard davit uninjured.  (3) At daylight on the morning of Sunday, February 24, 1884, the masts of wreck were seen standing out of the water at a point about four and a half miles off

shore, between Deal Beach and Long Branch, N. J., at a place where the lights of the Navesink bore N. by W. ½ W., and Long Branch pier N. W., about 12 miles south of Scotland light-ship. (4) On the 23d of February the steamer Newport left the city of New York bound for Cuba. She was an iron vessel of 2,875 tons register, and one of a regular line of steamers running between New York and Havana. As she went down the bay the weather became foggy and stormy, and the steamer achored in the lower bay about 4:25 or 4:30 P. M. At about 5:15 or 5:20 she got under way again. At about 5:40 Sandy hook was bearing W., and at about 5:50 she was abreast of the Scotland light-ship, passing it a half mile to a mile to the eastward. (5) After passing Scotland light-ship, she took a course of S. by E., on which she ran about 40 minutes, and then took a course of S. half W. After she passed the Scotland light-ship, she was going at a speed of about 14 knots an hour. (6) At about 6:40 P. M. of February 23d, the Newport had a collision with a schooner. She was then between six and seven miles off shore. (7) The Shaw, in the ordinary progress of her voyage, could have reached the point where the steamer and the schooner were in collision, or the point where the wreck referred to in the third finding was found, by 6:40 P. M. of that day. (8) The schooner with which the Newport so came in collision was not the John K. Shaw.

*Geo. A. Black,* for appellants.

*Robert D. Benedict,* for claimant and appellee.

LACOMBE, J., *(after stating the findings as above.)* On February 21, 1884, the libelants' schooner John K. Shaw sailed from Newport News, Va., bound for New Haven. Since then, except as a wreck, she has not been heard from. At daylight, on February 24th, masts were seen standing out of water at a point about four and a half miles off shore, between Deal Beach and Long Branch. Wreckage identified as coming from the Shaw was, on February 24th and subsequent days, found floating in the water or stranded at different places on the beach. On February 23, 1884, the steamer Newport, bound from New York to Havana, was in collision with an unknown schooner. The log states the time of the collision as 6:40 P. M., and adds that apparently no damage was done. These facts are undisputed. Libelants undertake further to show that the unknown schooner was the Shaw; that the collision occurred wholly through the steamer's fault; that it took place within half a mile of the place where the masts of the wreck, above referred to, were subsequently found; that the collision resulted in the starboard bow of the Newport breaking open the Shaw, and causing her to sink; that she did so sink within a few minutes after collision, at the place where the wreck was found; and that such wreck was in fact the Shaw. This case presents solely questions of fact; and to the careful and elaborate discussion of the testimony, which is found in the opinion of the learned district judge, little need be added by this court. As to certain points more or less relied upon by him,—such as the comparative heaviness of the Shaw's load, and the presence or absence of a deck-load on the schooner

with which the Newport was in collision,—the proofs in this court tend strongly to modify his opinion. But upon the whole case, as it now stands, there seems to be no sufficient reason to dissent from his conclusion. As one branch of the libelants' case, however, is fortified in this court by an argument, apparently not advanced before the district judge, a brief consideration of such argument will not be inappropriate. It is shown by direct evidence that the wreck, which libelants claim to be that of their vessel, lay probably about four and a half miles, certainly not more that five miles, off shore. They also contend that the schooner with which the steamer was in collision sank within a few minutes, and before she had sailed half a mile. In fact, the only theory upon which they undertake to maintain their contention that the colliding schooner was seriously injured is found in the statement of the two or three witnesses, who speak of her as listing over and going down within a few lengths. Unless, then, it can be shown that the steam-ship, at the time of the collision, was within half a mile of the place where the wreck was afterwards found, the claim that the steamer was in collision with the Shaw cannot be sustained. The weight of the direct testimony in the case is clearly to the effect, as the district judge found, that the Newport was from seven to eight miles off shore at the moment of collision; and that she passed Scotland light at such a distance, and thereafter followed such a course, at such a speed, as to bring her to that point at 6:40 P. M. The force of this evidence libelants seek to break by an acute and elaborate mathematical argument. Taking the compass bearings of Sandy Hook and of the Scotland light-ship as recorded in the logs, and laying down on the chart the angles formed thereby, counsel undertakes to show that the lines which subtend those angles could not have been traversed by the steam-ship within the time allowed by the logs upon any course other than the one which (contrary to the weight of the direct evidence) he assumes to be the one she followed, and certainly not on the course which the weight of the direct evidence shows her to have taken. This argument would no doubt have all the conclusiveness of a mathematical demonstration if its premises were as certain as those from which the mathematician reasons. Such, however, is not the case. The libelants rely upon these entries in the logs: "5:35 P. M., Sandy hook abeam, [engineer's log;] 5:40, Hook west, [steamer's log;] 5:50, passed Scotland light-ship, [steamer's log.]" Both the logs state the time of collision as 6:40 P. M. This is explainable either upon the supposition that the respective recording officers correctly noted the time, and that the time-pieces to which they referred agreed; or upon the supposition that some mutual agreement as to the time of this unusual, and possibly important, occurrence was arrived at before the entries were originally put down on the slate, or finally entered in the logs. On the same afternoon, however, the steamer had anchored for several minutes, and subsequently got under way. These occurrences are thus recorded in the logs: "4:25, thick weather, snow, came to anchor lower quarantine, [steamer's log;] 4:30, anchored, [engineer's log;] 5:20, clearing up, got under way, [steamer's log;] 5:15, started again, [engineer's log.]" The

discrepancy in these entries may be explained either upon the supposition that the time-pieces referred to by the recording officers did not agree, or upon the supposition that these officers did not note the time with absolute accuracy. Under either assumption we must be prepared to find similar variances in other similar entries made by the same officers at about the same time. When a margin of error so great as this [five to ten minutes] is to be allowed for, the entries as to the bearings of the hook and the light-ship cannot be trusted to support an argument so closely reasoned as that of libelants' counsel. The force of the direct testimony not being thus broken, and its weight supporting claimant's contention that the collision occurred at least more than six miles off shore, it follows that the unknown schooner which the Newport encountered was not the Shaw. The decision of the district court is affirmed, with costs.

### ON REHEARING.

#### (December 28, 1888.)

LACOMBE, J. The reargument in this case has covered so wide a range that I have felt it necessary to review the greater part of the testimony. No substantial change, however, has been thus wrought in the conclusions announced in the original opinion. I was not then able from the testimony to indicate upon the chart the exact position of the Newport at 6:40 P. M., nor am I now. The testimony as to the courses taken by that vessel after passing Scotland light-ship is not sufficiently positive to support the precise statement contained in the fifth finding, which was not as carefully drawn as it should have been, and should therefore be now amended by stating that she took a course of about S. by E., on which she ran about 40 minutes, and then took a course of about S. half W. The same finding should further be amended so as to state her speed after she passed the Scotland light-ship at over (instead of about) 14 knots an hour, as I feel satisfied, from a re-examination of the testimony, that I did not allow enough for the action of the wind, and entirely overlooked the operation of the tide. While unable to locate the precise position of the Newport at 6:40 P. M., my re-examination of the case has not changed the opinion heretofore formed that she was more than six miles off shore, and hence could not have sunk the wreck afterwards found four and a half miles off shore. The bearing testified to by Johnson was not overlooked upon the first examination of the case, nor was it doubted that he took the bearing accurately. It does not follow, however, that his unaided recollection of what that bearing was, and of the time and place at which (relatively to the steamer's prior movements) it was taken, should be accepted as controlling of the case, unless upon a weighing of his testimony in comparison with all the evidence considered as a whole the fair preponderance of probability is that the Newport and the Shaw were at the same place at 6:40 P. M. My former opinion as to the preponderance of proof on this point is unchanged by the reargument. With the alterations above suggested, the findings and conclusions may stand.